## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SUSAN M. DUNKEL,

            *Plaintiff*,

*v*.

COMMISSIONER OF SOCIAL
SECURITY,

            *Defendant*.

_____/

      CASE NO. 2:19-cv-10267

      DISTRICT JUDGE MARIANNA O. BATTANI
      MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 10, 14)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports Defendant Commissioner of Social Security's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (ECF No. 10), be **DENIED**, the Commissioner's Motion, (ECF No. 14), be **GRANTED**, and the Commissioner's final decision denying benefits be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Referral, (ECF No. 3), this case was referred to me to review the Commissioner's final decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF No. 8 at PageID.247-57). The case is

1

presently before the Court upon the parties' cross-motions for summary judgment. (ECF Nos. 10, 14).

Plaintiff Susan M. Dunkel was forty-one years old at the time of her amended onset date for her disability, August 14, 2014, and attained the age of forty-five on November 10, 2017. (ECF No. 8 at PageID.65). Before she was injured in an automobile accident in 2011, Plaintiff's past work history reflects that she worked as a waitress, bartender, office clerk, bench inspector, print machine operator, and automotive assembler. (*Id*. at PageID.64).

Plaintiff filed the present claims for a period of disability and disability insurance on May 9, 2015, and for supplemental security income on May 11, 2015. (*Id*. at PageID.247-255).[1] The claims were denied at the initial administrative stage on December 7, 2015. (*Id*. at PageID.121-122, 138-39). Plaintiff subsequently filed a written request for a hearing on February 8, 2016. On December 7, 2017, Plaintiff and vocational expert Diane Regan appeared and testified at the hearing before Administrative Law Judge ("ALJ") Lauren G. Burnstein. (*Id*. at PageID.73-102). In a written decision dated January 31, 2018, the ALJ found that Plaintiff was not disabled under the Social Security Act. (*Id*. at PageID.48-66).

Claimant appealed, but the Appeals Council declined to review the ALJ's decision.

---

[1] Plaintiff previously filed for disability benefits on November 8, 2011 and again on July 3, 2012. (ECF No. 8 at PageID.107). The Commission initially denied her applications on March 15, 2012 and November 21, 2012, respectively. (*Id*.). Subsequently, ALJ Michael F. Wilenkin determined that Plaintiff had not been under a disability as defined by the Social Security Act from May 8, 2011 through the date of his decision on December 24, 2013. (*Id*. at PageID.107, 156). The Appeals Council denied Plaintiff's appeals from those previous applications on March 24, 2015. (*Id*. at PageID.107).

(*Id.* at PageID.30-31). Claimant then filed the instant civil action seeking judicial review of the Commissioner's final decision. (ECF No. 1).

### B.   Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.   Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*,

475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to

be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir.

2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)). The RFC "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

## D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled from August 14, 2014 to the date of her decision. (ECF No. 8 at PageID.66). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 14, 2014, the amended alleged onset date of her disability. (*Id.* at PageID.51). At step two, the ALJ concluded that Plaintiff had the following severe impairments: "degenerative disc disease, cervical and lumbar spine; depressed mood; chronic pain syndrome; pulmonary nodule; coronary artery disease; and left hip disorder." (*Id.*). At step three, the ALJ determined that Plaintiff did not have an impairment or combination of

5

impairments that "met or medically equaled the severity" of a listed impairment. (*Id*.).

Before proceeding to the final steps, the ALJ found that Plaintiff had the residual functional

capacity (RFC) to perform

> [s]edentary work as defined in 20 CFR 404.1567 (a) and 416.967(a), except the claimant should avoid climbing stairs, ladders, and scaffolds in work activities; should have no prolonged or protracted walking; should not be required to twist or torque her torso through extreme ranges of motion; and can only stoop, squat, crouch and kneel occasionally. Work should require no bending from the waist to floor level, and no use of the upper extremities for overhead activities above shoulder level. The claimant should not be required to tolerate anything greater than mild concentrations of atmospheric irritants such as dust, smoke, fumes, noxious odors and the like. Mentally, the claimant can perform the usual, customary cognitive aspects of vocational functioning, meaning, she is able to understand, remember to follow instructions and follow through with and complete assigned tasks in a timely and appropriate fashion; should have only occasional contact with coworkers and supervisors; and should have no contact with the public. The claimant requires a sit/stand option, sitting up to 30 minutes at a time and standing up to 45 minutes at a time, and a handheld assistive device, such as a cane, for ambulation.

(*Id*. at PageID.54). At step four, the ALJ found that Plaintiff was unable to perform any

past relevant work. (*Id*. at PageID.64). At step five, the ALJ concluded that, considering

Plaintiff's age, education, work experience, and RFC, "there were jobs that existed in

significant numbers in the national economy that claimant can perform." (*Id*. at

PageID.65).

### E.    Administrative Record

#### 1.    Medical Evidence

The medical record begins on August 25, 2011, when Plaintiff was treated by Dr.

James Crampton for neck and back pain persisting from an automobile accident on May 8,

2011. (ECF No. 8 at PageID.382-396) The review of systems showed that Plaintiff was

6

positive for fatigue, back pain, peptic ulcer disease, headache, sensation of numbness and weakness, and mood changes. (*Id*. at PageID.386). The physical examination indicated that Plaintiff was fully oriented, was nondepressed and non-manic, and that her mood and affect were "congruent to the situation." (*Id*.). Further, he noted Plaintiff's back showed "no visible soft tissue swelling or erythema," and that Plaintiff had "difficulty with gait an [*sic*] upright posture and is listing to the right." (*Id*.). She had "TTP along the left paraspinal musculature" and "TTP along the left mid parathoracic musculature on palpitation." (*Id*.). Plaintiff's lumbar range of motion was "guarded and restricted in all ranges of motion." Her gait was antalgic, and her sitting straight leg raise was negative bilaterally. (*Id*.). At this visit, Plaintiff rated her back, arm, leg, and neck pain as 8 out of 10; it was persistent, constant, and aching and had been present since her accident in May of that year. (*Id*. at PageID.384).

On August 30, 2011, Plaintiff presented to Dr. Sean Conroy for her first lumbar epidural steroid injection to treat pain in her back and left leg, which was performed without any complications. (*Id*. at PageID.397-407). On September 13, 2011, Plaintiff returned to Dr. Conroy for the steroid injection without any complications aside from noting she was "uncomfortable." (*Id*. at PageID.408-415). On September 29, 2011, Plaintiff returned for her third steroid injection; she reported that the injections had helped alleviate her pain but that it persisted. (*Id*. at PageID.419-429).

On December 12, 2012, Plaintiff saw Dr. Salvia, presenting with low back pain, chronic pain, arm numbness, and sharp pain in her left leg. (*Id*. at PageID.539). Her review of systems showed that she was positive for blurred vision, cough, constipation, back pain,

leg pain, stiffness, anxiety, depression, and panic attacks. (*Id.*). Physical examination showed her lumbar spine was tender and had decreased flexion, extension, lateral bending; her left leg had a positive straight leg raise. (*Id.* at PageID.542).

Plaintiff visited Dr. Salvia on January 16, 2013 presenting with chronic pain and depression. (*Id.* at PageID.496). The review of systems showed that Plaintiff's blurred vision had improved; she was positive for constipation, cough, back pain, left radicular pain and numbness, worsened anxiety, worsened depression, worsened insomnia, and worsened panic attacks. (*Id.*).

During their visit on March 3, 2013, Doctor Salvia observed that Plaintiff's review of systems was positive for blurred vision, cough, dry cough, improved back pain, improved leg pain, shoulder pain, numbness, radicular pain, improved stiffness, worsened anxiety, worsened depression, worsened insomnia, and worsened panic attacks; Plaintiff denied abdominal pain, diarrhea, gastroesophageal reflux, constipation, and dyspnea. (*Id.* at PageID.534). The physical examination showed that Plaintiff's left shoulder had glenohumeral joint effusion, decreased abduction, pain with abduction, decreased and painful adduction, decreased and painful external and internal rotation, decreased and painful shoulder flexion, and increased and painful shoulder extension. (*Id.* at PageID.537).

On April 22, 2013, Plaintiff saw Dr. Salvia complaining of chronic pain and chest pain, and asking for refills. (*Id.* at PageID.492). Review of systems showed that Plaintiff was negative for everything. (*Id.*). Her left shoulder had decreased and painful abduction. (*Id.* at PageID.494).

In June of 2013, Dr. Salvia saw Plaintiff, who presented with shoulder pain, chronic

pain, chest pain, and a request for refills. (*Id*. at PageID.529). Plaintiff's review of systems showed she was positive for dyspnea and negative for, *inter alia*, depression, anxiety, insomnia, constipation, cough, panic attacks, heartburn, bloating, and blurred vision. (*Id*.). During the physical examination, Dr. Salvia observed that Plaintiff's lumbar spine was tender and that she had a positive left leg raise; her mood and affect were normal. (*Id*. at PageID.529-531).

In July 2013, Plaintiff saw Dr. Stephen Galens at Sterling Pulmonary Critical Care after having an abnormal CT scan. (*Id*. at PageID.356). During the physical exam, Dr. Galens noted Plaintiff did not appear in any distress, that her cardiac tones were regular, and that her extremities appeared without clubbing, cyanosis, or edema. (*Id*.). The follow-up on August 6, 2013 revealed the same physical examination results; the assessment showed Plaintiff had a solitary lung nodule, tobacco abuse, chronic obstructive pulmonary disease, and emphysema. (*Id*. at PageID.352).

On August 8, 2013, Plaintiff saw Dr. Salvia for refills; a review of systems showed Plaintiff was positive for dyspnea, knee pain, back pain, leg pain, and hip pain; Plaintiff denied night sweats, insomnia, visual disturbance, cough, bloating, diarrhea, heartburn, constipation, anxiety, depression, and panic attacks. (*Id*. at PageID.487-491).

On January 13, 2014, Plaintiff saw Dr. Salvia for chronic pain and requested refills. (*Id*. at PageID.524). Review of systems showed Plaintiff was positive for dyspnea, back pain, knee pain, and leg pain; she denied insomnia, night sweats, depression, bloating, cough, diarrhea, heartburn, constipation, anxiety, and panic attacks. (*Id*.). Dr. Salvia noted in the physical examination that Plaintiff did not have cardiovascular, respiratory, or

9

abdominal abnormalities; she had decreased and painful abduction in her left shoulder; positive straight leg raise in her left leg; normal gait; tender lumbar spine; and normal mood and affect. (*Id*. at PageID.526-28).

On February 14, 2014, Plaintiff saw Dr. Salvia for refills and complained of chronic aching pain; review of systems showed Plaintiff was positive for dyspnea, knee pain, back pain, leg pain, and hip pain; Plaintiff denied night sweats, insomnia, cough, bloating, diarrhea, heartburn, constipation, anxiety, depression, panic attacks, and visual disturbance. (*Id*. at PageID.482-86).

On May 14, 2014, Plaintiff visited Dr. Salvia for refills and noted that while she had chronic pain, it was controlled with medication, but her antidepressants were ineffective. (*Id*. at PageID.519). A review of systems showed Plaintiff was positive for leg pain, neck pain, hip pain, and back pain; and dyspnea. (*Id*.). Physical findings indicated that Plaintiff's lumbar spine was tender and she had positive left straight leg raise. (*Id*. at PageID.522).

On July 2, 2014, Plaintiff was seen by Dr. Salvia with bug bites, chronic pain, and requesting refills. (*Id*. at PageID.512). The review of systems showed Plaintiff was positive for dyspnea; back, hip, knee, and leg pain; sores, non-healing lesions, skin change, arthropod/insect bite; and cellulitis. (*Id*.). The review of systems showed Plaintiff denied night sweats, insomnia, depression, anxiety, panic attacks, bloating, cramping, diarrhea, constipation, abdominal pain, and coughing. (*Id*.). The physical examination indicated that Plaintiff was well nourished, in no acute distress, good grooming; normal and non-tender thyroid; no respiratory or cardiovascular deficits; no deficits in the range of motion for her upper extremities, hips or spine; no neurological abnormalities; no chest irregularities; soft

10

and benign abdomen; and oriented to person, time, and place. (*Id*. at PageID.516-18).

On August 6, 2014, Plaintiff presented to Dr. Tayeb with abdominal pain and dyspepsia and underwent a gastroscopy, an antral biopsy, and a distal esophagus biopsy. (*Id*. at PageID.372). The esophageal examination results were "unremarkable, no ulcers, erosions, or mass seen," while the "antrum was notable for moderate erythema" but otherwise "no ulcers, erosions, or masses seen." (*Id*. at PageID.362-63). The retroflection exam showed that "angularis, lesser curve, cardia, fundus examination unremarkable." (*Id*. at PageID.363). The pathology report indicated that the gastric antrum biopsy was consistent with reactive gastropathy and that the distal esophageal biopsy was consistent with mild reactive and reflux epithelial changes. (*Id*. at PageID.372). The recommendation for treatment was 20 milligrams of Prilosec once a day for two months. (*Id*. at PageID.363).

On August 14, 2014, Plaintiff saw Dr. Salvia for medication refills; Plaintiff's physical examination and review of systems findings were unchanged from her July 2 visit. (*Id*. at PageID.505-511). On September 9, 2014, Plaintiff saw Dr. A. Mazhari with symptoms of lower back pain that radiated to her left calf, thigh, and hand and was aggravated by walking, bending, sitting, and standing, but mitigated with pain medications and heat application; the MRI showed "just degenerative changes" and Dr. Mazhari recommended physical therapy. (*Id*. at PageID.451-52).

On October 13, 2014, Plaintiff went to the emergency room for a wound on her right forearm, apparently a spider bite. (*Id*. at PageID.431). The physical examination noted that she was oriented as to time, place, and person and appeared well-nourished and not in distress; she had a normal range of motion in her neck; no respiratory distress; normal range

11

of musculoskeletal motion; and normal mood, affect, judgment, and thought content. (*Id.* at PageID.432).

Plaintiff presented to Dr. Salvia on October 29, 2014 complaining of bug bites, ulcerative colitis, and chronic pain; Dr. Salvia noted the same physical examination findings from her July and August visits, except that the tenderness in her cervical lumbar spine had appreciated. (*Id.* at PageID.472-78). On November 29, 2014, Plaintiff underwent an MRI of her lumbar spine, which showed a small central disc protrusion at L5-S1 abutting the S1 nerve roots. (*Id.* at PageID.445-46).

On December 3, 2014, Plaintiff visited Dr. Salvia complaining of back pain. (*Id.* at PageID.462). In the review of systems, Dr. Salvia noted that Plaintiff was positive for the following: night sweats, difficulty sleeping, insomnia, vision change, cigarette smoking, cough, dyspnea on exertion, heartburn, gastroesophageal reflux, constipation, hot flashes, panic attacks, anxiety, depression, and tingling and numbness in her left leg, and pain in her back, leg (with radicular pain in her left leg). (*Id.*). The physical exam showed that Plaintiff had diminished left and right lower lung fields and expiatory wheezes in her left and right upper lung fields; she had normal bowel sounds and needed to walk with a cane. (*Id.* at PageID.464).

On January 2, 2015, Plaintiff visited Dr. Salvia complaining of left lower back pain that radiated to her left groin and buttocks, and ulcerative colitis with worsening intermittent abdominal pain, cramping, rectal bleeding, diarrhea, constipation, and bloating. (*Id.* at PageID.467). The review of symptoms included difficulty sleeping, coughing, cigarette smoking, vision change, back pain, leg pain, neck pain, radicular pain,

normal bowel sounds, tingling in her left leg, numbness, and gastroesophageal reflux. (*Id*.).
On January 8, Plaintiff visited Dr. Mazhari, reporting that her back pain had not changed
since their September 2014 visit and rated her pain level at a 5 out of 10. (*Id*. at
PageID.544). Dr. Mazhari noted that the MRI Plaintiff had in November did not go along
with her symptoms. (*Id*. at PageID.545).

On March 10, 2015, Plaintiff saw Dr. Salvia presenting with paralumbar, lumbar
lower left back pain that radiated to her left groin and buttock and was sharp and constant.
(*Id*. at PageID.457). The review of systems noted that Plaintiff's night sweats, chills,
difficulty sleeping, and insomnia had been resolved; she experienced changed vision and
needed bifocals; gastrointestinal reflux, bloating, diarrhea, constipation, heartburn, and
abdominal pain; back, leg, and neck pain; anxiety, panic attacks, and depression; tingling
and numbness in her left leg. (*Id*.). Plaintiff was in distress secondary to pain and used a
cane. (*Id*. at PageID.459).

Plaintiff went to the Michigan Head and Spine Institute in June 2015 to be examined
by Dr. Fahim; she complained of neck numbness and pain, tingling sensations, back pain,
and weakness in her right foot, rating her pain a 7 out of 10. (*Id*. at PageID.569-587). Dr.
Fahim noted in the physical examination that Plaintiff was afebrile with normal vital signs
and was not in acute distress; she was oriented as to person, time, and place; all her
extremities had 4+/5 motor strength in all muscle groups except her hand intrinsics, which
were 4/5 bilaterally; her right-sided reflexes measured 3+, while her left measured 2+; she
had a Hoffman's sign bilaterally that was more severe on the right than the left. (*Id*. at
PageID.585). Plaintiff had pain with rising from a seated position and walked with

abnormal gait; she was unable to put weight reliably on her right foot and was unable to perform heel or toe walking. (*Id.*). Dr. Fahim noted that Plaintiff seemed to sway slightly to the right and walked in the same way. (*Id.* at PageID.586). Cervical movement and forward flexion resulted in tingling and numbness in Plaintiff's arms and down her spine. (*Id.*). Forward bending and lateral rotation in the waist resulted in significant lumbar pain. (*Id.*). Plaintiff had positive straight leg raise on the left, some tenderness over the left sacroiliac joint; no tenderness over her right sacroiliac joint. (*Id.*).

Plaintiff underwent an MRI of her cervical and lumbar spine on June 22, 2015. (*Id.* at PageID.592-97). The lumbar spine findings were mostly "unremarkable" except that at L5-S1 there was mild disk dehydration with mild disk space narrowing; there was grade 1 retrolisthesis with a 4.5mm broad-based herniation, hypertrophic changes of facet joints, and ligamentum flavum thickening; moderate canal stenosis and mild to moderate bilateral foraminal stenosis. (*Id.* at PageID.592). The cervical spine MRI showed a mass-like lesion along the right anterolateral aspect at level T1-2 anterior to the neural foramen, which they noted could be a schwannoma, neurofibroma, or cystic mass; a bulging disk at level C4-5; a bulging disk with mild left sided foraminal stenosis at level C5-6; and a bulging disk with mild to moderate left-sided foraminal stenosis at level C6-7. (*Id.* at PageID.594).

On September 1, 2015, Plaintiff met with state agency consultative examining psychologist Dr. Nancy Gardner. (*Id.* at PageID.598-603). Dr. Gardner noted that Plaintiff presented with good contact with reality, very low self-esteem, and was pleasant and cooperative; she showed a degree of autonomy and motivation and adequate insight. (*Id.* at PageID.599). Her mood was noted as depressed and her affect was sad. (*Id.* at

PageID.600). She was oriented x3; she recalled three of three objects after three minutes; she could name current events, former presidents, cities, and celebrities. (*Id.*). She was diagnosed with Major Depressive Disorder. (*Id.* at PageID.601). Dr. Gardner further noted Plaintiff "demonstrated adequate understanding of both simple and complex instructions and to interact appropriately with others." (*Id.* at PageID.602). The prognosis for improved psychological and adaptive functioning was "fair." (*Id.*).

On August 6, 2015, Plaintiff was reevaluated by Dr. Fahim, who noted that her motor strength, sensory perception, and reflexes were not changed from her visit on June 11. (*Id.* at PageID.621-624). Plaintiff saw Dr. Salvia on August 26, 2015, complaining of back pain, ulcerative colitis, and chronic pain. (*Id.* at PageID.715). The review of systems showed Plaintiff was positive for night sweats, chills, difficulty sleeping, insomnia; vision change; cigarette smoking, cough, and dyspnea on exertion; bloating, cramping, heartburn, abdominal pain, constipation, diarrhea, and gastroesophageal reflux; hot flashes; back pain, leg pain, radicular pain, and neck pain; left leg tingling and numbness; and depression, anxiety, panic attacks and insomnia. (*Id.*). The physical examination showed she was in distress secondary to pain, needed to walk with a cane, her lung fields were diminished, and she was oriented as to time, place, and person. (*Id.* at PageID.717-718).

On September 8, 2015, Plaintiff was reevaluated by Dr. Fahim, who noted that an apical paraspinal mass had been "resolved" and that the visit therefore was to focus on Plaintiff's lumbar spinal and lower extremity pain. (*Id.* at PageID.618). The physical examination indicated that Plaintiff experienced worsened spinal pain with forward flexion and lateral rotation at the waist. (*Id.* at PageID.619). Plaintiff experienced pain rising from

15

a seated position and back pain with ambulation. (*Id*.).

On December 1, 2015, Plaintiff saw Dr. Salvia for refills; her review of systems was unchanged from their visit in August. (*Id*. at PageID.720-24). On February 5, 2016, Plaintiff saw Dr. Salvia and complained of worsening depression, insomnia, and chronic low back pain. (*Id*. at PageID.725-29). Plaintiff's review of systems was unchanged from her last visits except that her depression and insomnia had worsened; she needed to walk with a cane and was in distress secondary to pain. (*Id*.).

On April 15, 2016, Plaintiff presented with atypical chest pain as her chief complaint; it was also noted that she had lumbar disc disease, anxiety, GERD, abnormal EKG, elevated troponin, coronary artery disease, was a smoker, and had ulcerative colitis without complications. (*Id*. at PageID.685). Plaintiff underwent a lumbar L5-S1 discectomy and fusion with instrumentation. (*Id*. at PageID.689). Plaintiff was transferred on April 17 and saw Dr. Marsalese for a cardiology consultation; laboratory findings showed elevated troponins and tachycardia; Plaintiff's physical examinations and review of systems yielded unremarkable results and it was noted that she was alert, cooperative, and not in acute distress. (*Id*. at PageID.662-67). On April 20, Plaintiff had myocardial perfusion imaging which revealed a small reversible perfusion defect and normal wall motion and myocardial thickening with a left ventricle ejection fraction of greater than 70%. (*Id*. at PageID.670).

Progress notes from Mary Franklin, RN, NP-C, in May 2016 detailed that Plaintiff had coronary artery disease with angina pectoris, pure hypercholesterolemia, GERD, was a cigarette smoker, and had ulcerative colitis without complications. (*Id*. at PageID.655).

16

Plaintiff was noted to be "stable from a cardiac standpoint." (*Id*.). An electrocardiogram showed that Plaintiff had normal sinus rhythm. (*Id*. at PageID.656). On May 14, Plaintiff followed up with Dr. Salvia, who noted she was recovering well from her surgery; review of systems was the same as their last several visits. (*Id*. at PageID.730-33). On May 17, Plaintiff met with Dr. Fahim, who noted that she was recovering from her noninvasive appropriately. (*Id*. at PageID.713-14).

Plaintiff saw Dr. Marsalese on July 12, 2016, who reported that Plaintiff's CT angiogram indicated noncritical coronary artery disease and that she had 25-50% stenosis in LAD. (*Id*. at PageID.653).

On July 15, 2016, Plaintiff reported to Dr. Salvia that her pain was alleviated with rest and use of a back brace. (*Id*. at PageID.734). She presented with ADD and hypertension. (*Id*.). She exhibited distress secondary to pain but did not use a cane. (*Id*. at PageID.737). On August 4, 2016, Plaintiff presented to Dr. Fahim with lumbar and lower extremity pain. (*Id*. at PageID.710). The physical examination showed that her bilateral upper and lower extremity strength was 5/5 for all muscle groups, that she had intact sensory perception to light touch, normal gait, and 2+ reflexes. (*Id*. at PageID.711). Forward and lateral bending at the waist exacerbated Plaintiff's pain. (*Id*.).

On August 15, 2016, Plaintiff underwent an MRI study of her lumbar spine. (*Id*. at PageID.773-75). The clinical impression from the scan was that there had been an interbody fusion hardware at level L5-S1 with artifact obscuring the disc space and suggestion of marrow edema in the endplates. (*Id*. at PageID.773). Other findings included: "normal" lumbar vertebral height, mild dextroconvex scoliosis, no fracture, no

17

spondylolisthesis, no instability on flexion or extension, no osseous lesions or fractures seen, and "unremarkable" perivertebral soft tissues. (*Id*. at PageID.775).

On September 16, 2016, Dr. Salvia noted that Plaintiff's back pain was "non-radiating"; review of systems showed Plaintiff was positive for insomnia, night sweats, and difficulty sleeping; vision change; cigarette smoking, coughing, dyspnea upon exertion; bloating, cramping, heartburn, abdominal pain, constipation, diarrhea, and gastroesophageal reflux; back pain, leg pain, neck pain, and radicular symptoms; left leg tingling and numbness; anxiety, depression, and panic attacks. (*Id*. at PageID.741).

Plaintiff followed up with Dr. Salvia again on November 15, 2016. (*Id*. at PageID.746-750). Review of systems showed Plaintiff was positive for insomnia, night sweats, and difficulty sleeping; vision change; cigarette smoking, coughing, dyspnea upon exertion; bloating, cramping, heartburn, abdominal pain, constipation, diarrhea, and gastroesophageal reflux; back pain, leg pain, neck pain, and radicular symptoms; and left leg tingling and numbness; anxiety, depression, and panic attacks. (*Id*.).

On December 1, 2016, Dr. Fahim noted that Plaintiff reported "significant improvement in the preoperative lower extremity symptoms and associated back pain," that Plaintiff had no new complaints of pain," that she "continued to be pleased with the results of the operation," and that Plaintiff had complained of left-sided hip pain. (*Id*. at PageID.707). Physical examination from this visit showed that she had 5/5 motor strength in all muscle groups and tenderness to palpation over the left sacroiliac joint; Dr. Fahim noted that the x-ray of the lumbar spine indicated "excellent alignment of the instrumentation and hardware without any evidence of abnormality or complication." (*Id*.

18

at PageID.708).

Plaintiff followed up with Dr. Salvia on January 13, 2017, presenting with chronic pain, back pain, and cellulitis. (*Id.* at PageID.751). Review of systems showed Plaintiff was positive for cellulitis, back pain, leg pain, radicular symptoms, myalgias; Plaintiff denied insomnia, anxiety, panic attacks, depression, difficulty sleeping, GERD, abdominal pain, constipation, and diarrhea. (*Id.*).

On March 15, 2017, Plaintiff saw Dr. Salvia again, complaining her back pain was getting worse and radiating and that physical therapy only worked for a short time. (*Id.* at PageID.757). Review of systems showed Plaintiff was positive for back pain, leg pain, radicular symptoms, myalgias; Plaintiff denied insomnia, anxiety, panic attacks, depression, difficulty sleeping, GERD, abdominal pain, constipation, diarrhea, and cellulitis. (*Id.*).

On April 18, 2017, Plaintiff was reevaluated by Dr. Fahim, who noted that Plaintiff wanted an operative intervention to fix her sacroiliac joint instead of injections (because Plaintiff did not like the injections); the physical examination results indicated she was in no acute distress; she continued to have abnormal gait; her motor strength was 5/5 in all extremities; her reflexes were 2+ bilaterally; and "palpitation of the left-sided sacroiliac joint results in exquisite tenderness." (*Id.* at PageID.704-705).

On May 18, 2017, Plaintiff was examined by cardiologist Richard E. Gordon; Plaintiff denied dyspnea, syncope, edema, palpitations, and chest pain but noted her activities were limited due to her lack pain. (*Id.* at PageID.650). Plaintiff underwent an electrocardiogram, which showed she had normal sinus rhythm and nonspecific T-wave

flattening. (*Id*.). Her bowels and bladder were reported to be "OK;" and her condition was unchanged since their previous visit in 2016. (*Id*. at PageID.651).

On May 19, 2017, Plaintiff reported to Dr. Salvia that she was seeing a therapist for depression, that her pain was controlled with medication, and that Celexa had not been effective. (*Id*. at PageID.762). The review of systems showed Plaintiff was positive for back pain; Plaintiff denied insomnia, anxiety, panic attacks, depression, difficulty sleeping, GERD, abdominal pain, constipation, and diarrhea. (*Id*.). The physical examination showed that she did not appear to be in acute distress, she used a cane, her lumbar spine and left-side facet joint were tender, and she had a decreased range of motion. (*Id*. at PageID.764-65).

Plaintiff followed up with Dr. Salvia on July 20, 2017. (*Id*. at PageID.767-772). She complained of chronic pain, which she noted was exacerbated by the weather and alleviated with medication. (*Id*. at PageID.767.). Physical examination showed no abnormalities except that Plaintiff was underweight. (*Id*. at PageID.769-771).

### 2.     Function Reports

### i.     Plaintiff's Function Report

Plaintiff completed a function report on June 24, 2015. (ECF No. 8 at PageID.301-308). In it, she noted that she was homeless or "living between places" and that she either stayed in her truck or at the homes of her friends or sisters. (*Id*. at PageID.301.). Her impairments limited her ability to work in that she experienced daily pain, difficulty sleeping, and flareups from colitis; her depression was to a level where she did not want to get out of bed or speak to anyone and caused uncontrollable crying at times; and her anxiety

was to a level where she did not want to go to the doctor or eat. (*Id*.). What she did daily depended on her levels of pain, anxiety, depression, and colitis flareups. (*Id*. at PageID.302). She noted that she could not do much when she slept in her truck or go places when she felt worthless and depressed. (*Id*.). She did not care for anyone else but occasionally took care of her sister's pets when staying with her. (*Id*.).

Plaintiff noted the activities she could no longer do as a result of her impairments: dancing, driving on vacation, taking her girls on rollercoasters, baking, camping, shopping, having sex, and being in stable relationships. (*Id*.). Her conditions affected her sleep; she noted that she had unstable sleep habits depending on her levels of pain, depression, or anxiety about her financial status. (*Id*.).

Regarding personal care, Plaintiff noted she had no issues showering or feeding herself; she could dress herself as long as she had something to sit or lean on; she had to sit to shave her legs because she could not bend over or extend her legs to do so; depending on her pain levels or colitis flareups, she had a difficult time sitting normally on a toilet and getting up; she could wash her hair but was unable to hold a blow dryer over her head for long; she needed to hold onto things to walk and was unable to sleep on her left side; and she noted she had soiled herself at times when she could not make it to a restroom in time. (*Id*.).

Regarding food preparation, Plaintiff noted that prior to the onset of her conditions, she cooked full meals every day, baked desserts, and enjoyed trying new things culinarily; since the onset of her impairments, she noted, she was no longer able to. (*Id*. at PageID.303). Since the onset of her impairments, she noted she prepared her own meals—

21

usually frozen ones—but would cook if she was staying with someone. (*Id*.). She noted she prepared her own meals approximately weekly and that it took her about 20 minutes to do so. (*Id*.). She indicated that she did not do any housework or yardwork because she was homeless. (*Id*.).

Plaintiff noted that she went places only when she had to, and that when she did, she drove or rode in a car. (*Id*. at PageID.304). She could go out by herself and was able to drive. (*Id*.). She explained that she shopped in stores "only when [she] need[ed] food," and that it took her about fifteen minutes to shop depending on the lines and what she was buying. (*Id*.). Plaintiff indicated that she could count change, handle a savings account, and use a checkbook; she explained that she could pay bills if she "had the means." (*Id*.). Her ability to handle money had changed since the onset of her impairments in that she had no money unless she borrowed it. (*Id*. at PageID.305).

Plaintiff's hobbies included writing, crosswords, sudoku, and watching television. (*Id*.). She wrote every day, watched television when she stayed with someone, and did crosswords and sudoku on her phone. (*Id*.). She did not spend time with others. (*Id*.). She went to parks by herself and occasionally visited people when she had the money for gas. (*Id*.). She needed reminders to go to appointments; she noted that she had short-term memory issues and that she needed to keep a memo book. (*Id*.). She sometimes needed someone to accompany her to doctors' appointments. (*Id*.).

Plaintiff noted that she had issues getting along with others. (*Id*. at PageID.306). Specifically, Plaintiff explained that her friends and family did not understand her situation, injuries, or colitis flareups; her pain levels were too high to interact with others; she had

22

mood swings and did not want to be bothered when crying. (*Id*.). Since the onset of her impairments, Plaintiff noted that the changes in her social activities included not seeing her children as often, not being able to host her grandson overnight, no longer being social, and not going anywhere. (*Id*.).

She indicated that her impairments affected her abilities to lift, bend, stand, reach, walk, sit, kneel, talk, climb stairs, see, remember, complete tasks, concentrate, understand, get along with others, and follow instructions. (*Id*.). Plaintiff elaborated further that she could squat but could not lift over 20 pounds; that she could not bend from the waist down; that she could stand for about 10 minutes before feeling shooting pains; that reaching up was painful for her; that she could not walk long before being out of breath; that sitting too much caused pain; that she could not kneel and that stairs were hard to climb; that she had blurry vision and daily or hourly memory loss; that she was easily distracted and had difficulty concentrating; that she had to re-read instructions a few times; and that she experienced mood swings. (*Id*.). She noted she could walk about two blocks before feeling pain and needed to rest for about 5 or 10 minutes after doing so, sometimes longer, depending on her pain levels. (*Id*.). She noted she was righthanded. (*Id*.). She could not pay attention for long—approximately five minutes, depending on her pain. (*Id*.). Plaintiff noted that she did not finish what she started; she needed to reread written instructions a few times if she had completed the task before but became irritated upon reading instructions for something new. (*Id*.). Regarding spoken instructions, Plaintiff noted that she sometimes had to ask for clarifications; she could not focus when she experienced serious pain and often forgot where she left off. (*Id*.).

23

Plaintiff noted she often had strained relationships with authority figures because she became frustrated and lost her temper and sometimes cried because of her pain. (*Id*. at PageID.307). She had never been fired from a job for inability to get along with coworkers or superiors. (*Id*.). Plaintiff explained she had noticed that she was more short-fused since the onset of her impairments and feared "not being normal again." (*Id*.). She used prescription glasses every day and started using a cane when she noticed she had been falling; she wore the glasses daily and used her cane depending on her pain levels. (*Id*.).

Plaintiff took Morphine, Celexa, Valium, and Oxycodone; she noted that Oxycodone and Morphine caused her constipation. (*Id*. at PageID.308). In the "Remarks" section, Plaintiff explained that she had "always had an outgoing personality," that she had worked since age 14, and that she felt her illness made her unattractive and was embarrassed. (*Id*.). Further, she noted she felt that her injuries had taken her independence; she was afraid she would drop her grandson if she held him; she felt that she was "missing time [she] would never get back." (*Id*.). Finally, she mentioned that she had recently gotten an MRI that showed she had "something in [her] neck" and that her next appointment was July 9, 2015. (*Id*.).

### ii.    Third Party Function Report

On June 24, 2015, Plaintiff's sister, Faith Alcorn, completed a third-party function report. (ECF No. 8 at PageID.293-300). In it, Alcorn noted that she had known Plaintiff for 42 years and that she and Plaintiff spent one to two days a week together sitting and talking. (*Id*. at PageID.293). She reported that Plaintiff was homeless. (*Id*.). She noted that Plaintiff's illness made her unable to sit or stand for long periods of time, that it caused

Plaintiff constant pain, and that Plaintiff could not lift anything heavy. (*Id.*). She noted that Plaintiff did not take care of anyone else but occasionally let her sister's dogs out or fed them when she stayed with her sister. (*Id.* at PageID.294). Alcorn reported that activities Plaintiff could no longer do since her illness included dancing, cleaning, working, going to amusement parks, and playing with kids. (*Id.*). Alcorn noted that Plaintiff's condition affected her sleep in that Plaintiff woke up in pain and could only sleep on one side. (*Id.*). Regarding personal care, Alcorn noted that Plaintiff's abilities to shower, feed herself, and care for her hair were unaffected by her impairments, but that Plaintiff needed to hold onto something or sit in order to dress herself, had to sit to shave, and that she did not know if Plaintiff needed assistance using the toilet. (*Id.*). She reported that Plaintiff did not need any specific reminders for health or personal care but did need to set an alarm to remember to take her medications. (*Id.* at PageID.295). Alcorn noted that Plaintiff prepared her own meals but that she did not know the type of meals Plaintiff prepared, how often Plaintiff prepared her meals, or how long it took Plaintiff to prepare her meals. (*Id.*). Alcorn noted further that Plaintiff did not perform housework or chores because she was homeless. (*Id.*).

Alcorn reported that Plaintiff went out for doctors' appointments and to shop for food and that Plaintiff was able to get around on her own by driving her car. (*Id.* at PageID.296). Regarding money, Alcorn indicated that Plaintiff could count change, use a checkbook, and handle a savings account; Plaintiff could not pay bills because she had no income. (*Id.*). Further, she noted that Plaintiff's ability to handle money had not changed since her injury. (*Id.* at PageID.297).

Alcorn noted that Plaintiff's hobbies included writing, playing computer games,

cooking, and dancing; although Alcorn was unsure of how often or how well Plaintiff did these activities, Plaintiff could no longer dance or engage in physical hobbies since the onset of her conditions. (*Id*.). She reported that Plaintiff spent time having conversations with family and did not do so "often enough," that Plaintiff needed reminders to go to her doctors' appointments, and that she was unsure of what places Plaintiff went regularly. (*Id*.). Moreover, Alcorn noted that Plaintiff had issues getting along with others in that Plaintiff was sad, depressed, and had "no social skills anymore." (*Id*. at PageID.298). Alcorn elaborated, explaining that Plaintiff was often "very short with people" and that Plaintiff was easily saddened or angered. (*Id*.).

Alcorn indicated that because of Plaintiff's impairments, she was limited in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, concentration, and getting along with others. (*Id*.). She explained that Plaintiff could not sit for a long period, lift heavy items, or squat or kneel without needing help up; Plaintiff had difficulty concentrating due to her pain and had issues getting along with others due to her sad and angry emotional state. (*Id*.). She noted that Plaintiff was righthanded and estimated Plaintiff could walk about a block before needing to stop and rest for a few minutes, depending on how much pain she was in. (*Id*.). Alcorn indicated that Plaintiff could pay attention for a few minutes and did not finish what she started; Alcorn did not know how well Plaintiff followed written instructions. (*Id*.). She noted that Plaintiff could follow spoken instructions well if they were "not difficult" and that Plaintiff could not follow spoken instructions well for "hard things." (*Id*.).

Alcorn reported that Plaintiff did not get along well "at all" with authority figures.

(*Id*. at PageID.299). She further noted that Plaintiff did not handle stress or changes in routine well and had noticed that Plaintiff was afraid to drive or engage in physical activity. (*Id*.). Alcorn indicated that Plaintiff needed a cane, glasses, and motor scooter: Plaintiff had worn glasses all her life and "always" needed to wear them; she needed the cane to help her walk after the accident; and she used the motor scooter for grocery shopping. (*Id*.).

Alcorn reported that Plaintiff took and had side effects from the following medications: Morphine, Celexa, Valium, and Oxycodone. (*Id*. at PageID.300). The Morphine and Oxycodone made Plaintiff sleepy and affected her ability to concentrate; the Valium made Plaintiff sleepy; and the Celexa caused Plaintiff to have mood swings. (*Id*.).

### 3.     Administrative Hearing

### i.     Plaintiff Testimony

At the administrative hearing on December 7, 2017, Plaintiff testified that she had been living alone in her car for almost three years. (ECF No. 8 at PageID.81). She noted she slept in her truck even when it was cold outside. (*Id*.). She told the ALJ that she showered when she stayed at a friend's house. (*Id*.). She had no pets. (*Id*. at PageID.82). She explained that she had a high school education and was "certified in robot" when she worked at Ford. (*Id*.).

Plaintiff said she had not worked since 2011, when she was in an automobile accident. (*Id*. at PageID.83). She had tried to find work right after the accident but had not looked for anything recently. (*Id*.). She worked a part-time job doing waitressing, bartending, and beer-carting in 2010-2011 at a golf course for 35 to 38 hours a week for about two years and occasionally made tips when she waitressed or bartended. (*Id*. at

PageID.83-84). She also worked at Friction Control and Lowen Enterprises; she did management for workers, set up machinery, worked in shipping and secretarial roles, cut checks, and repaired machines. (*Id.* at PageID.84).

Plaintiff then noted that her condition had worsened; she needed another surgery. (*Id.* at PageID.85). She testified that she could not work because of limitations in her abilities to sit, stand, and bend; she could sit for about 20 to 30 minutes depending on her pain level, and could not sit on her left side at all. (*Id.*). She could stand for 30 to 45 minutes and walk for less than a block. (*Id.* at PageID.85-86). She stated that the most she could lift and carry was about five pounds. (*Id.* at PageID.86). She had difficulty bending and twisting, which made it difficult to do things around a host's house without squatting. (*Id.*). Her daily activities depended on her pain rate; on a good day, she would visit family and friends, although most of her family lived out of state. (*Id.*).

Plaintiff then noted that she experienced the side effects of drowsiness, dizziness, blurriness, and tiredness from her medications. (*Id.* at PageID.87). She could shower by herself but needed to hold onto something or sometimes sit down, depending on her pain level. (*Id.*). She used the bathroom by herself. (*Id.*). She could drive. (*Id.*). She cooked when she stayed at someone's house. (*Id.* at PageID.87-88). When living in her truck, she would stop at gas stations for food and used the microwaves at gas stations or her family's house. (*Id.* at PageID.88). When staying with others, she helped unload the dishwasher, clean, prepare, for parties, and cook. (*Id.*). She used a laundromat for her laundry. (*Id.*).

Plaintiff noted her sleep was "[t]errible." (*Id.* at PageID.89). Her pain kept her awake and her medications made her sleep "a lot of hours." (*Id.*). She testified that she did

not drink alcohol or use recreational drugs, nor had she ever received any treatment for drug or alcohol abuse. (*Id*.). She smoked about eight or nine cigarettes a day. (*Id*.).

Plaintiff was then examined by her attorney. (*Id*. at PageID.90). Noting that she had been diagnosed with chronic pain syndrome, Plaintiff explained her pain varied depending on if she took her medications and whether they worked, which she found depressing and frustrating. (*Id*.). She experienced a "major, major change" in the speed with which she walked since the accident; she had to slow down and could no longer walk like she could when she worked in assembling, waitressing, or bartending. (*Id*.). She had to use mobility aids to go shopping or stand. (*Id*.). She noted she was in pain at the time of the hearing and had to lean on something. (*Id*. at PageID.90-91). When asked if she would be able to stand and/or walk for a total of an hour and a half during an eight-hour workday, Plaintiff responded that she could not because she would "have to be able to sit down with being unstable on [her] left side," bend, and use her cane to stand. (*Id*. at PageID.91). She noted that given the unpredictability of days she would have stability for any job, she would probably not be able to work at a job where she had the option to sit and stand at her will. (*Id*.). She noted further that she would not be able to focus on some occasions with her medication because of her short-term memory loss. (*Id*.). She testified that there was never a point where she was standing or walking in which she did not hold onto something. (*Id*.). She was most comfortable lying or sitting on her right side as long as she did not have pressure on her left. (*Id*. at PageID.91-92). She could lie on her side for three to five hours daily. (*Id*. at PageID.92). She could not sit on a hard wood chair. (*Id*.).

She noted that her doctors wanted to do a sacroiliac joint fusion and they had

informed her that she would not have function in her left side if she did it; she was unsure about getting the surgery because she would have to use a cane or wheelchair because her degenerative bone disease would make it impossible for her to rotate her hip. (*Id*. at PageID.93). She noted she had had ulcerative colitis for "a long time" and that it had been getting worse "throughout the years" and that it was worse than it had been in 2015. (*Id*.). She noted there had been times when she had not made it to the bathroom on time, and that she would not be able to stay on task in a work environment unless they allowed her to use the bathroom when she needed to do so; even then, she noted, "if it has flared up, [she] might not make it, depending on how far the bathrooms are." (*Id*. at PageID.94).

Plaintiff noted that her ulcerative colitis caused her stomach pain and affected her emotional, mental, and sexual health; a flareup had also prevented her from having a surgery at a particular time. (*Id*. at PageID.94-95). She then explained her mental health suffered and that she had depression; she could not pick up her grandson or put him in her car. (*Id*. at PageID.95). From a mental health standpoint, Plaintiff noted she had good days and bad days. (*Id*.). On bad days, Plaintiff did not want to talk to anyone; she would be in so much pain she could not answer her phone; she would miss appointments; and she would want to be left alone because she felt frustrated and depressed. (*Id*. at PageID.96). Her bad days had increased to more than two or three a week. (*Id*.).

### ii.    Vocational Expert Testimony

The ALJ then asked the vocational expert (VE) to consider

> a hypothetical individual of claimant's age, education, and with the past jobs you described. This individual is limited to sedentary work, should avoid climbing stairs, ladders, and scaffolds, and work activities that have no prolonged or protracted

30

walking; should not be required to twist or torque her torso through extreme ranges of motion; can only stoop, squat, crouch, and kneel occasionally; should require no bending from the waist to floor level; no use of upper extremities for overhead activities above shoulder level; should not be required to tolerate anything greater than mild concentrations of atmospheric irritants such as dust, fumes, smoke, fumes, noxious odors, and the like.

Mentally, she can perform the usual customary cognitive aspects of vocational functioning, meaning she is able to understand, remember, and follow instruction, follow through with and complete assigned tasks in a timely and appropriate fashion; should have only occasional contact with coworkers and supervisors and no contact with the public.

(*Id.* at PageID.97-98).

The VE responded that an individual fitting this description would not be able to perform any of Plaintiff's past work, but that there was other work the individual could perform in the national economy. (*Id.* at PageID.98). The VE posited that at the sedentary, unskilled level, an individual fitting the above description could work in the position of an inspector, of which there were 100,000 jobs nationally; a sorter, of which there were 100,000 jobs nationally; and an assembler, of which there were 100,000 jobs nationally. (*Id.*).

The ALJ expanded on the hypothetical and asked the VE to consider the same hypothetical "except this individual requires a sit-stand option, can sit up to 30 minutes in time, and can stand up to 45 minutes at a time; require a handheld assistive device such as a cane for ambulation. Can this individual perform any work in the national economy?" (*Id.*). To which the VE responded that the same jobs she identified would remain and at the same numbers. (*Id.*).

The ALJ then asked the VE to assume the same as above "except this individual

31

would be off-task at least 20 percent of the day due to pain, poor psychological systems. Can this individual perform any work in the national economy?" to which the VE responded that there was no competitive employment for an individual matching the description. (*Id*. at PageID.99).

The attorney then asked the VE if there would still be employability if "instead of adding 20 percent off-task during the day, add the need for two unscheduled 45-minute breaks." (*Id*.). The VE responded there would be no competitive employment. (*Id*.). The attorney then asked the VE if instead of the 45-minute breaks, the hypothetical person were to be unable to show up to work twice a month based on their symptoms and be employable. (*Id*.). The VE replied that a person "can miss one time per month on a consistent basis. Anything beyond that is work preclusive." (*Id*.). The attorney then asked if there were unskilled work that could be performed if the person were limited to lifting no more than five pounds and was unable to stoop, to which the VE noted that the same jobs she previously identified could still be performed in the same numbers. (*Id*. at PageID.99-100).

## F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[2] carve the evidence into "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified

---

[2] Various regulations were amended after the claim was filed. See, e.g., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). The governing regulations here, however, expressly apply to claims filed before March 27, 2017, like Plaintiff's. See 20 C.F.R. § 404.1527.

psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both   "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, she is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from her treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the

34

claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[3] Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting

---

[3] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider various factors. 20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

### G.   Analysis

Plaintiff's arguments all center around the ALJ's consideration and application of Listing 1.04(a). (ECF No. 10 at PageID.791). Plaintiff makes three arguments, each of which I will address in turn.

#### i.   Plaintiff's argument that the ALJ erred by not finding Plaintiff's degenerative disc disease met Listing 1.04(a)

Plaintiff's first argument is that the ALJ erred in her Step 3 determination that Plaintiff's cervical and lumbar spinal degenerative disc disease did not meet or medically equal Listing 1.04(A) because, in Plaintiff's view, the evidence presented was "uncontradicted" and showed that Plaintiff's degenerative disc disease "met each part of listing 1.04(A)." (*Id.* at PageID.795).

36

As Plaintiff notes in her brief, Listing 1.04(A) addresses:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R pt. 404, subpt. P, app. 1, listing 1.04(A).

As the Court noted in *Sullivan v. Zebley*, for "a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." 492 U.S. 521, 530 (1990). Therefore, since Plaintiff has the burden of proving that she met all elements of listing 1.04(a), Plaintiff must prove that she has a disorder of the spine resulting in compromise of nerve root or spinal cord *and* (1) evidence of nerve root compression, (2) limitation of motion of the spine, (3) motor loss, (4) sensory or reflex loss, and "if there is involvement of the lower back, positive straight leg raising test." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04(A).

Although there are several instances in which Plaintiff can show she met most of these requirements, the failure to meet one is preclusive to meeting the listing pursuant to the precedent in *Zebley*. The Eastern District of Michigan has consistently held that even though a Plaintiff meets part of listing 1.04(A), the requirements are conjunctive, and all must be met to meet the listing. *See Brown v. Comm'r of Soc. Sec.*, No. 12-14506, WL

6537980 at * 11 (E.D. Mich. Nov. 18, 2013), *rep. & rec. adopted* 2013 WL 6538136 (E.D. Mich. Dec. 13, 2013); *see also Paul v. Comm'r of Soc. Sec.,* Case No. 2:17-cv-12391, 2018 WL 4500200 (E.D. Mich. Aug. 24, 2018); *Biehl v. Comm'r of Soc. Sec.,* Civ. No. 14–10293, 2015 WL 736366 (E.D. Mich. Feb. 20, 2015).

In her evaluation, the ALJ noted that Plaintiff's degenerative disc disease did not meet or medically equal listing 1.04 because Plaintiff "lack[ed] the requisite motor and sensory deficits and there is no evidence of spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication." (ECF No. 8 at PageID.51). Plaintiff contends that by considering "disc protrusion . . . that abutted S1 nerve roots" (referencing the MRI from November 2014) and "foraminal stenosis" (referencing the MRI from June 22, 2015), the ALJ should have concluded Plaintiff had a nerve impingement or compression. (ECF No. 10 at PageID.794). With that said, as *Adams v. Comm'r of Soc. Sec.* notes, abutting nerve roots are insufficient to satisfy listing 1.04(A)'s requirement for nerve root compression. No 13-11132, 2014 WL 897381, at *9 (E.D. Mich. Mar. 6, 2014).

Plaintiff provides scant support in her brief to attack the heart of the ALJ's rationale for concluding she did not meet the listing: that Plaintiff lacked the requisite motor and sensory deficits. She merely cites the RFC, which stipulates that Plaintiff could not do long or protracted walking, could not engage in twisting or torqueing with her torso at extreme ranges of motion, could not use arms for overhead activities above the shoulder level, needed a handheld assistive device. (*Id*. at PageID.795). Plaintiff does not explain why these stipulations in the RFC amount to a deficit in sensory or motor skills sufficient to meet the requirement enumerated in listing 1.04(A). In fact, the objective evidence suggests

that she did not have a deficit in sensory or motor skills.

For example, in July and August of 2014, Plaintiff was noted to have no range of motion deficits and no abnormalities in reflexes or motor functions. (ECF No. 8 at PageID.515-516). Then on October 13, 2014, when Plaintiff was seen at the emergency room for bug bites, the physical examination noted that she had a normal range of motion in her neck; no respiratory distress; normal range of musculoskeletal motion. (*Id*. at PageID.432).

In June 2015, Dr. Fahim noted in the physical examination that Plaintiff's extremities had 4+/5 motor strength in all muscle groups except her hand intrinsics, which were 4/5 laterally; her right-sided reflexes measured 3+, while her left measured 2+. (Id. at PageID.585). In the next visit the following August, Dr. Fahim noted that Plaintiff's motor strength, sensory perception, and reflexes were not changed from her visit on June 11. (*Id*. at PageID.621-624).

During her August 4, 2016 to Dr. Fahim, the physical examination showed that her bilateral upper and lower extremity strength was 5/5 for all muscle groups, that she had intact sensory perception to light touch, normal gait, and 2+ reflexes. (*Id*. at PageID.711). On December 1, 2016, Dr. Fahim noted that Plaintiff reported "significant improvement in the preoperative lower extremity symptoms and associated back pain," that Plaintiff had no new complaints of pain," that she "continued to be pleased with the results of the operation," and that Plaintiff had complained of left-sided hip pain. (Id. at PageID.707). Physical examination from this visit showed that she had 5/5 motor strength in all muscle groups, tenderness to palpation over the left sacroiliac joint; Dr. Fahim noted that the x-ray

of the lumbar spine indicated "excellent alignment of the instrumentation and hardware without any evidence of abnormality or complication." (*Id.* at PageID.708).

Then, on April 18, 2017, Dr. Fahim noted her motor strength was 5/5 in all extremities; her reflexes were 2+ bilaterally (*Id.* at 705).

Plaintiff followed up with Dr. Salvia on July 20, 2017. (*Id.* at PageID.767-772). She complained of chronic pain, which she noted was alleviated with medication. (*Id.* at PageID.767.). The physical examination showed no abnormalities except that Plaintiff was underweight. (*Id.* at PageID.769-771).

The foregoing constitutes substantial evidence to support the ALJ's listing analysis. As noted, Plaintiff does not point to contrary evidence or explain why the evidence above is unreliable. Consequently, based on Plaintiff's failure to address her motor and sensory deficits, I am unpersuaded by her argument.

### ii.     Plaintiff's argument that the ALJ failed to consider the elements of Listing 1.04(a)

Plaintiff's second argument is that the ALJ erred by "only summarily referenc[ing]" Listing 1.04 during Step 3 of her sequential evaluation. (ECF No. 10 at PageID.792). Specifically, Plaintiff notes that the medical evidence, which the ALJ credited, established all necessary elements for her degenerative disc disease to meet listing 1.04(A) on its own. (*Id.*). Plaintiff contends that, pursuant to 5 U.S.C. § 557(c)(3)(A), the ALJ's decision "must provide 'findings and conclusions, and the reasons or basis therefore, on all the material issues of fact, law, or discretion presented on the record.'" (*Id.* at PageID.791). Plaintiff further notes that such an analysis must include "making mention of a relevant listing,

40

setting forth the listing's criteria, and analyzing the medical evidence as it relates to the listing." (*Id*. at PageID.791-92). Thus, Plaintiff argues that because the ALJ did not explicitly set forth the listing's criteria by "only summarily referc[ing]" the listing, neglecting to articulate consideration for the other two elements of the listing, the ALJ erred. (*Id*. at PageID.792-94).

The ALJ's initial discussion of the listing appears sparse at first glance, but she considered and analyzed Plaintiff's abilities in question later in the opinion—after thoroughly summarizing the medical findings, the ALJ analyzed Plaintiff's sensory and motor skills and objective lumbar spinal findings. (*See id*. at PageID.61-63). The Court has held in the past that an ALJ's discussion of a listing, even when lacking discussion of specific items of evidence in the Step Three section, did not require a remand "since the ALJ's opinion as a whole demonstrates sufficient consideration of the relevant evidence." *Gower v. Comm'r of Soc.Sec*., 2015 WL 163830, at *9 (E.D. Mich. Jan. 13, 2015).

Because the ALJ discussed and analyzed the issues relevant to the listing requirement later in her opinion, the ALJ's articulation of the listing at step three is sufficient.

Moreover, even if the ALJ had erred by making a conclusory finding at step three, the Sixth Circuit has held that an "ALJ's conclusory findings at step three [are] harmless error where the plaintiff did not put forth sufficient evidence to demonstrate that his or her impairments met or medically equaled the severity of the listing." *See Smith–Johnson v. Comm'r of Soc. Sec*., 579 Fed.Appx. 426, 432 (6th Cir. 2014). As the objective medical evidence showed, substantial evidence supported the ALJ's finding. Plaintiff has not put

41

forth sufficient evidence or analysis to demonstrate that she had the requisite combination of sensory, motor, and spinal deficits to meet the listing; thus, any error is harmless.

Because the ALJ's opinion as a whole provided sufficient consideration of the listing, and because Plaintiff does not provide sufficient evidence that her impairments meet the listing to overcome harmless error, I am unpersuaded by this argument.

> ### iii.   Plaintiff's argument that the ALJ erred by failing to elicit the opinion of a medical expert regarding whether the listing was equaled.

Plaintiff's third and final argument is that the ALJ erred by not eliciting the opinion of a medical expert to determine the equivalence of the listing. (ECF No. 10 at PageID.796). She does not present an argument with evidence that such an equivalence exists, but maintains that her case requires remand because the ALJ did not elicit a medical opinion for her equivalence finding. Plaintiff's argument here is based on a 1996 regulation; under SSR 17-2p, the agency no longer requires the ALJ to obtain evidence from a medical expert prior to making a step 3 finding that the individual's impairment does not medically equal a listed impairment. SSR 17-2p, 2017 WL 3928306, at *4. Under the new regulations, courts have observed that "an ALJ need not obtain evidence from a medical expert on equivalence if the 'evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment.'" *See Balknight v. Comm'r Soc. Sec.*, Case No. 18-11843, 2019 WL 4011881, at *26 (E.D. Mich. July 31, 2019) (quoting *Thurston v. Comm'r of Soc. Sec.*, No. 18-12744, 2019 WL 2617049, at *3 (E.D. Mich. June 10, 2019) (collecting cases; citation omitted), *Rep. & Rec. adopted by* 2019 WL 2613180 (June 26, 2019)); ("In SSR 17-2p, the Social Security Administration

42

clarified that an ALJ is not required to obtain a medical expert's opinion before making a finding that an individual's impairments do not equal a listing impairment...."), *Rep. & Rec. adopted by* 2019 WL 2120121 (W.D. Mich. May 15, 2019); *Jammer v. Comm'r of Soc. Sec.*, No. No. 18-10445, 2019 WL 1372171, at *7 (E.D. Mich. Feb. 22, 2019) ("[T]he absence of a medical opinion on the issue of equivalency does not defeat the ALJ's Step Three findings."), *Rep. & Rec. adopted by* 2019 WL 1354037 (E.D. Mich. Mar. 26, 2019). Based on these recent decisions from this court, it appears that Plaintiff is incorrect in her argument that the ALJ was obligated to obtain a medical expert's opinion prior to concluding that Plaintiff's limitations did not amount to a listed impairment.

For these reasons, I am unpersuaded by Plaintiff's final argument.

### H.    Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision. Consequently, I recommend **DENYING** Plaintiff's Motion, (ECF No. 10), **GRANTING** the Commissioner's Motion, (ECF No. 14), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985);

*Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 23, 2020                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 23, 2020                     By s/Kristen Castaneda
                                           Case Manager